## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Adam W. Anderson, a Task Force Officer with the Drug Enforcement Administration ("DEA"), United States Department of Justice, being first duly sworn, depose and state underoath as follows:

1. This affidavit is made in support of a criminal complaint against Quiana THOMPSON (hereinafter, "THOMPSON"), charging that on or about April 7, 2025, THOMPSON committed the following federal offenses:

    a. Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## TRAINING AND EXPERIENCE

2. I am a State Trooper with approximately eighteen years of law enforcement experience and have been employed by Ohio State Highway Patrol (OSP) since April 2017. In August 2025 I was promoted to the rank of Sergeant. I am currently assigned as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Cleveland Office and have been assigned since November 2020. I was employed by the City of Wooster Police Department, Wayne County, Ohio, prior to being employed as a StateTrooper. I have a Master of Science degree in Criminal Justice Administration and Management. I have received specialized training at the Ohio State Highway Patrol Trooper Academy, the Medina County Law Enforcement Training Academy, and the Ohio Peace Officer Training Academy (OPOTA). I am currently certified as a State Trooper and am an OPOTA Certified State of Ohio Instructor and have been so since 2014. I have received training regarding the identification of controlled substances and the operation of drug trafficking individuals and organizations. I have further received training in the identification, organization and various ways drug trafficking organization's structure and mask

1

their operations.

3. I have been involved in investigating numerous individuals involved in the manufacturing, distribution, and use of controlled substances in both the United States and Foreign Countries. I have successfully conducted investigations that have resulted in drug traffickers' arrests and the seizure of significant quantities of drugs, money, and weapons both inthe United States and foreign countries. I have surveilled drug traffickers' operations and have interviewed numerous people personally involved in the sale, transport, and use of narcotics. Through this training and experience, I have become familiar with and have gained a thorough understanding of the methods, manner, and means used by individuals engaged in the unlawful manufacturing, trafficking, transportation, and use of controlled substances.

4. I have gained knowledge that members and co-conspirators of complex drug trafficking organizations utilize various veiling methods and engage in activities in efforts to thwart the efforts of law enforcement personnel. In particular members of drug trafficking organizations commonly utilize multiple cellular phones and subscribe said phone numbers in the names of fictitious people or relatives. Members also utilize numerous vehicles, and exchange vehicles at irregular intervals, with said vehicles being registered to relatives, fictitious companies, or in the names of invented individuals. I also have experience recognizing members of drug trafficking organizations engaging in driving maneuvers that are designed to assist criminals in the possible identification of law enforcement personnel who are engaging in surveillance operations. I also know drug traffickers use multiple residences in an effort to thwartlaw enforcement by separating the fruits of the crimes, to different locations. I know it is common for drug traffickers to use apartments, in order to blend in with multiple other residences, making it difficult for law enforcement to locate their location. All of these activities are done in the hope that criminal activities will be disguised.

5. Based on my training and experiences in other investigations, I have conducted numerous analyses of billing and toll records for telephones used by drug traffickers. I know drug trafficking is often furthered by using multiple cellular phones, multiple insulated contacts, and pre-paid cellular phones, which is also known as compartmentalization. The use of the telephones in this manner is designed to help avoid detection by law enforcement.

6. I know based upon training and experience that drug trafficking and money laundering organizations routinely use a number of other operational techniques, designed and implemented to achieve two goals: first, the successful distribution of controlled substances and the subsequent collection of the proceeds of that illegal activity; and second, the minimization of the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

7. I have participated in multiple drug cases, some of which have been Title III investigations, involving drug trafficking activities and have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.

8. I also know from training and experience that drug traffickers periodically change, or "drop," their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to

thwart law enforcement interception of communications.

9. Unless otherwise noted, wherever in this Affidavit, I assert a statement was made, my observations provided the information, or another special agent or law enforcement officer, or witness who had either direct or hearsay knowledge of that statement to whom I, or others, have spoken or whose reports I have personally read and reviewed. This Affidavit does not contain every piece of information known to me and otherinvestigators, but rather only information sufficient to establish probable cause to support the requested warrant.

## PROBABLE CAUSE

<u>Medical Event in Cuyahoga County Jail and identification of THOMPSON</u>

10. On April 3rd, 2025, a medical emergency took place at the Cuyahoga County Jail, 1215 West Third Street, Cleveland, Ohio. Corrections Officers located an inmate face down near a cell toilet unresponsive, with pinpoint and agonal breathing. Responding officers suspected this medical emergency was an overdose event based on the symptoms they were witnessing. Narcan was provided to the inmate on three occasions prior to being transported to the hospital.

11. Following the overdose, Cuyahoga County Deputies and Cuyahoga County Jail Investigators initiated an investigation into the medical event. Days before the overdose, Investigators conducted multiple recorded prisoner interviews in reference to drug trafficking and overdose events happening in the jail. Through these interviews, Corrections Officer Quiana THOMPSON was identified as the individual possibly bringing the narcotics into the facility.

12. After conducting the interviews, investigators reviewed THOMPSON's movements within the Cuyahoga County Jail through identification card swipe data and overhead surveillance footage. Utilizing this data, investigators were able to identify THOMPSON opening a cell door on March 26, 2025, at 4:13 a.m. belonging to the suspected inmate who had distributed the narcotics throughout the facility. In addition, THOMPSON was not assigned to this area of the

facility and had no reason or official business to go into this area or the prisoner's cell. It was later determined during an interview outlined in paragraph 15, THOMPSON admitted this was a drug drop to the inmate of illegal narcotics that she brought into the Cuyahoga County Jail.

<u>Traffic stop of Quiana THOMPSON on April 7, 2025</u>

13. On April 7, 2025, investigators established surveillance on THOMPSON's residence after monitoring a recorded prison phone call,[1] which indicated narcotics were going to be delivered into the jail. Investigators believed based on their interviews, prior surveillance and intelligence gathered from recorded prison phone calls that THOMPSON was going to be the individual delivering the narcotics.

14. In the late afternoon, investigators established surveillance on THOMPSON following her shift at the Cuyahoga County Jail. After leaving the jail, investigators observed THOMPSON traveling straight to the inmate's mother's residence who had placed an order for narcotics. THOMPSON was observed by investigators parking on Fowler Street, at which point investigators observed the inmate's mother come out of the residence, approach the passenger side window of THOMPSON's vehicle, conduct a suspected hand to hand drug transaction. Following this hand-to-hand transaction, THOMPSON immediately left the inmate's mother's residence. Investigators maintained surveillance on THOMPSON until she was traffic stopped for an expired tag and driving under suspension by Cuyahoga County Sheriff Michael Twombly.

15. Deputy Twombly utilized his K-9 partner to sniff the exterior of the vehicle. His K-9 partner Atilla[2] gave a positive alert to the odor of illegal narcotics. A probable cause search was conducted and officers located twenty-one (21) pills of methamphetamine, two (2) cellular telephones, a container with marijuana, twenty-five (25) suboxone strips, and two (2) white pieces

---

[1] The prison phone monitoring system plays a message to both the inmate and the call recipient, "This call is subject to monitoring and recording."
[2] K-9 Atilla is a single purpose narcotics K-9, certified through the Ohio Peace Office Training Academy and the National American Police Work Dog Association. K-9 Atilla's certification expires on May 25, 2026.

of paper- MDMB-4en-PINACA[3].

16. An interview was conducted with THOMPSON. THOMPSON admitted she received four payments. The first payment was $400 in exchange for conveying approximately 6 sheets of paper covered with synthetic marijuana. The second payment was also $400 to convey approximately seven sheets of paper and ten suboxone strips. The third payment was for $300 for approximately 8 pages of synthetic marijuana and 10 suboxone strips. The fourth exchange took place at her residence, 5114 Fowler Avenue, Cleveland, Ohio.

17. The narcotics seized during the traffic stop were sent to the Cuyahoga County Regional Forensic Science Lab where the products tested positive for:

- 25 Suboxone Strips – Buprenorphine and naloxone
- 21 Pills – Methamphetamine
- 2 Pieces of Paper – MDMB-4en-PINACA

---

[3] The narcotics seized in THOMPSON's vehicle, matched the order placed by the inmate on the jail phone.

## **CONCLUSION**

18. Based on the facts set forth in this affidavit, I submit there is probable cause to believe that on or about April 7, 2025, in the Northern District of Ohio, Quinana THOMSPON committed the offense of Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). I, therefore, request that this Court issue a criminal complaint and arrest warrant for Quiana THOMPSON.

Adam W. Anderson
Task Force Officer
Drug Enforcement Administration

This affidavit was sworn to by the affiant by FaceTimes after a PDF was transmitted by email, per Federal Rule of Criminal Procedure 4.1



January 26, 2026

James E. Grimes Jr., United States Magistrate Judge